```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION


Zebulon Enterprises, Inc.,       )
                                 )
         Plaintiff,              )
                                 )
                                 )
     v.                          )   No. 19-cv-5165
                                 )
                                 )
DuPage County, Illinois,         )
                                 )
         Defendant.              )
                                 )
```

Memorandum Opinion and Order

Plaintiff Zebulon Enterprises, Inc. ("Zebulon"), an adult bookstore and entertainment facility, sued DuPage County, Illinois ("DuPage") to challenge DuPage's adult-entertainment ordinance, AHAB-O-0031-19 (most recently amended as AHAB-O-0031B-19), as violative of Zebulon's rights under the First and Fourteenth Amendments as well as under the Illinois Constitution. DuPage has now moved for summary judgment on Zebulon's surviving counts--its first, third, fifth, seventh, and eighth claims for relief in the operative Third Amended Complaint. For the reasons that follow, the motion for summary judgment [101] is granted in part and denied in part.

I.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Since at least the mid-1980s, Zebulon has operated an adult bookstore in unincorporated DuPage County. ECF No. 120-1 ¶¶ 1, 13. In addition to a retail sales section, Zebulon's establishment includes two "adult arcade" rooms that house twenty-nine private video viewing booths in which customers may view sexually explicit materials on the premises. *Id.* ¶ 3.

On June 25, 2019, DuPage County adopted adult business ordinance AHAB-O-0031-19. *Id.* ¶ 11. The stated purpose of the ordinance was "to promote and enhance the health, safety, and general welfare of the citizens of the County, by combating and, or, alleviating negative and harmful secondary effects associated with adult businesses . . . including: crime (namely sex crimes, prostitution, violence against women and children, public indecency, public lewdness, drug sales, use and possession and human trafficking); adverse effects on nearby properties . . . ; blight . . . ; health concerns (unsanitary conditions, spread of

sexually transmitted diseases); impacts on public services . . . ; and eliminate the dehumanizing influence that adult businesses might have on their employees." ECF No. 101-4 ¶ 2. Per the adopting ordinance, DuPage's Ad Hoc Adult Business Committee considered extensive evidentiary materials concerning the secondary impacts of adult businesses in connection with its development of the ordinance, including secondary effects associated particularly with video viewing booths, which materials included: 56 judicial decisions, 43 academic studies or articles, legislative findings of other jurisdictions, and the testimony of multiple witnesses including law enforcement, real estate, and local business personnel. ECF No. 120-1 ¶¶ 31, 34-35.

The ordinance was amended twice--first on December 10, 2019, and again on November 10, 2020. *Id.* ¶ 12. Zebulon challenges two main aspects of the ordinance as currently enacted. First, in Sections 20-257, 20-258, and 20-254(B)(4), the ordinance establishes a license requirement for all adult business employees that imposes a $300 application fee and required human trafficking training. *See* ECF No. 59 ¶¶ 60-61; ECF No. 100-3. Zebulon contends that the fees and training requirements are expensive and burdensome. Second, Zebulon argues that Section 20-264 would require it to make "numerous and costly physical changes" to its premises. *See* ECF No. 59 ¶ 68. The burdens imposed by the ordinance, Zebulon argues, threaten to put it out of business and

3

unconstitutionally restrict its rights to freedom of speech and expression.

## II.

The First Amendment protects non-obscene, sexually explicit speech of the type offered in Zebulon's adult video arcade. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 224 (1990), *holding modified by City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004). Because "the central thrust of Zebulon's claim is that it is being regulated out of existence through . . . the Ordinance's new building layout requirements," the ordinance is best evaluated under the framework set out in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), which has been used in zoning-ordinance cases. *Zebulon Enters., Inc. v. DuPage Cnty.*, 438 F. Supp. 3d 881, 887-88 (N.D. Ill. 2020). The *Renton/Alameda* framework instructs that "courts reviewing regulations of adult entertainment establishments [must] consider: (1) whether the regulation constitutes an invalid total ban or merely a time, place, and manner regulation, (2) whether the regulation is content-based or content-neutral, and accordingly, whether strict or intermediate scrutiny is to be applied, and (3) if content-neutral, whether the regulation is designed to serve a substantial government interest[,] [is narrowly tailored to serve that interest,] and allows for reasonable alternative channels of

4

communication." *R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 407 (7th Cir. 2004); *see BBL, Inc. v. City of Angola*, 809 F.3d 317, 327 (7th Cir. 2015).

On its face, the ordinance in question is a time, place, or manner restriction; it imposes licensing and physical premises requirements rather than prohibiting erotic expression outright. *See R.V.S.*, 361 F.3d at 409 (ordinance requiring exotic dancing nightclubs to obtain special-use permits and prohibiting their operation in certain areas was a time, place, or manner restriction); *see also Metro Pony, LLC v. City of Metropolis*, No. 11-cv-144-JPG, 2011 WL 746201, at *2 (S.D. Ill. Feb. 24, 2011) (same for ordinance requiring annual licensing of sexually oriented businesses and establishing facility requirements regarding, for example, lighting and room size). Accordingly, I proceed to the second inquiry, which determines whether strict or intermediate scrutiny applies.

In the context of the second prong of the *Renton/Alameda* analysis, "[t]he 'content-neutral' label . . . is a misnomer; regulations aimed at adult businesses apply to certain types of speech and not others" so are necessarily content-based, but nevertheless, "[r]egulations on sexually oriented businesses are nearly always reviewed under intermediate scrutiny." *BBL*, 809 F.3d at 325. Rather than an examination of content neutrality, the "second step is best conceived as an inquiry into the purpose

5

behind the ordinance." *R.V.S.*, 361 F.3d at 407. When, as here, "the government relies on a secondary-effects justification to regulate [sexually oriented] expression, we 'presume that the government did not intend to censor speech' and therefore apply intermediate scrutiny." *BBL*, 809 F.3d at 326. Of course, the legislature voicing the "magic words" "secondary effects" does not end the inquiry; "whether the adverse secondary effects invoked by the municipality have a basis in reality and are likely to be reduced by the challenged regulation are important inquiries in the intermediate-scrutiny analysis." *Id.* But "the potential or actual invalidity of [the government's secondary-effects] explanations doesn't trigger strict scrutiny. As long as 'one purpose of the ordinance is to combat harmful secondary effects,' the ordinance is regarded as content neutral (despite the legal fiction) and thus intermediate scrutiny applies." *Id.* (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) (plurality opinion)).

Because the facial purpose of the ordinance was to combat secondary effects, I have no trouble concluding that intermediate scrutiny applies here. The relevant inquiry, then, for each of the challenged provisions of the ordinance, is "whether the regulation is designed to serve a substantial government interest[,] [is narrowly tailored to serve that interest,] and

allows for reasonable alternative channels of communication." *R.V.S.*, 361 F.3d at 407; *BBL*, 809 F.3d at 327.

### III.

Turning first to claim III, Zebulon challenges the ordinance's employee licensing fee. Section 20-257(A) makes it unlawful "to act as an adult business employee . . . without a valid adult business employee license." ECF No. 100-3 § 20-257(A). Those licenses must be applied for, and under Section 20-258(G), "[e]ach new application shall be accompanied by the non-refundable fee of three hundred dollars." *Id.* § 20-258. The licenses expire at the end of each year. *Id.* § 20-262(C).

"[A] governmental body may enact a reasonable permit fee requirement to defray the cost of administering permissible regulation of a particular form of speech." *S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 897 (7th Cir. 1991). However, where it does so, the government bears the burden to demonstrate that its imposed fee "is not excessive in that it did not exceed the [government]'s costs in enforcing its . . . regulations." *Id.* at 898. DuPage has not met that burden here.

In support of its $300 employee licensing fee, DuPage offers an affidavit from Jeff Martynowicz, Chief Financial Officer of DuPage County. ECF No. 101-25 ¶ 3. Mr. Martynowicz concludes that the approximate cost to DuPage of issuing a new employee

7

license is approximately $440, and the cost of renewing a license is approximately $370. *Id.* ¶¶ 14-15. But Mr. Martynowicz fails to show his work. He purports to have arrived at those numbers by adding hourly labor costs and the cost of materials, *id.* ¶¶ 7-8, 10, but offers no dollar values for those inputs, instead seemingly conjuring his numbers from the air. I cannot conclude based on Mr. Martynowicz's affidavit that DuPage has met its burden to demonstrate the nexus between its costs and the imposed fee as a matter of law. *See S.-Suburban*, 935 F.2d at 898 (for-sale sign ordinance imposing permit fees was unconstitutional where "the City failed to present any specific evidence of dollar values reflecting either the revenue it generated from its sign permit fees or its costs in administering its sign regulations").

Claim III also challenges the ordinance's human-trafficking training requirements. The ordinance requires that as a prerequisite to issuance or renewal of both the adult business license, which is required for facilities, and the adult business employee license, applicants complete a course in human trafficking. ECF No. 100-3 at §§ 20-254(B)(4), 20-258(E). The course is "designed to inform applicants of signs of human trafficking, potential punishments for human trafficking, how to report suspected human trafficking, and services available for victims." *Id.*

8

DuPage undoubtedly has a substantial interest in curtailing any human trafficking occurring within its borders. And in enacting the ordinance, DuPage did consider evidence tending to show that adult businesses in the county were associated with suspected human trafficking. ECF No. 120-1 ¶ 37.[1] However, DuPage has pointed to no evidence linking human trafficking to adult businesses such as Zebulon's, which sell erotic materials and house video viewing booths, but which do not employ live performers. In fact, the police testimony DuPage's Ad Hoc Adult Business Committee considered suggested that most suspected victims of human trafficking in DuPage county were "sex workers" employed in the county's "encounter spa-type businesses"--not retail employees selling adult fare. ECF No. 101-4 ¶ 27. Indeed, Zebulon (the incorporated county's only adult bookstore) has had only incidental contact with DuPage law enforcement, and such contact has had nothing to do with human trafficking. ECF No. 120-1 ¶ 23; 101-7 ¶ 6. DuPage County has not shown as a matter of law, in other words, that its human-trafficking training requirement is

---

[1] Zebulon objects to certain of the evidentiary materials considered by DuPage as hearsay, but it is proper to "rely[] on the findings and preamble of the statute and the reports cited therein" in the context of a *Renton/Alameda* analysis. *Andy's Rest. & Lounge, Inc. v. City of Gary*, 466 F.3d 550, 554-55 (7th Cir. 2006).

narrowly tailored to achieve its interest of curtailing human trafficking. Summary judgment is denied as to claim III.[2]

## IV.

Claim VII, which I consider next, challenges Section 20-264(C) of the ordinance, which requires that there be "no fewer than two (2) doorways which provide egress from any room in which a peep show booth/video viewing room is located." ECF No. 100-3 § 20-264(C). But each of Zebulon's two video arcade rooms already has two exits--an emergency exit and a doorway connecting each arcade area to the bookstore's main retail area--bringing Zebulon's business into compliance with Section 20-264(C). ECF No. 120-1 ¶¶ 49-51; ECF No. 101-3. DuPage argues that Zebulon therefore has no standing to challenge that section. I agree.

To have standing to assert a claim, a litigant must "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The party invoking federal jurisdiction has the burden of establishing standing, and at the summary judgment stage, the plaintiff must meet that burden by

---

[2] Claim I is a blanket First-Amendment challenge to the ordinance. ECF No. 59 ¶¶ 53-58. Because I deny the motion for summary judgment as to claim III, which challenges a specific provision of the ordinance under the First Amendment, claim I may also proceed.

10

setting forth specific facts in support. *Lujan*, 504 U.S. at 561. Moreover, when a plaintiff "attack[s] a number of diverse provisions of [an] ordinance," its "standing to sue must be evaluated with respect to each specific challenge." *Genusa v. City of Peoria*, 619 F.2d 1203, 1209 (7th Cir. 1980); *see also Tee & Bee v. City of West Allis*, No. 92-C-1299, 1993 U.S. Dist. LEXIS 22002, at *10 (E.D. Wis. Mar. 11, 1993) (plaintiff had standing to challenge certain provisions of adult-establishment ordinance but not others).

Here, Zebulon has pointed to no evidence that it has been injured as a result of Section 20-264(C). Zebulon's business is already in compliance, so there seems to be no risk that Zebulon would be cited for a violation. And Zebulon has not indicated that it intends to remove any doorways from its arcade rooms. In the absence of any evidence that Zebulon has suffered a concrete and particularized injury as a result of Section 20-264(C), I conclude that Zebulon does not have standing to challenge it. Summary judgment is granted as to claim VII.

V.

Finally, in claim V, Zebulon challenges Section 20-264 as a whole in that it would "requir[e] numerous and costly physical changes to [Zebulon]'s premises." ECF No. 59 ¶ 68. Section 20-264 does require certain physical alterations to the premises; I consider each in turn.

11

First, the ordinance requires that there be "an unobstructed view from a manager's station of every area of the premises to which patrons are permitted access, including the interior of each peep show booth/video viewing room, but excluding restrooms." ECF No. 100-3 § 20-264(B). In the same vein, under Subsection E, "[n]o door, curtain, or obstruction of any kind shall be installed within the entrance to a peep show booth/video viewing room." ECF No. 100-3 § 20-264(E). With these restrictions, DuPage hoped to deter lewd, unsanitary, and criminal acts in secluded areas of the premises, including masturbation, public sex, and drug sales. *See* ECF No. 101-4 ¶¶ 81-83.

Zebulon asserts that, with the exception of cleaning and maintenance staff, it usually operates with a single on-duty clerk who occupies a station behind a counter near the front entrance in order to handle retail transactions and screen customers as they enter. ECF No. 59 ¶¶ 48-49. The clerk does not have a clear sightline into the arcade rooms from that position. *See* ECF No. 101-3. However, Zebulon need not necessarily change the layout of its store to come into compliance with the ordinance. Per Subsection B, "[i]n the event that the interior of the structure of an existing adult entertainment facility is configured such that all areas of the premises to which patrons are permitted access are not within a direct line of sight view from a manager's station, such areas shall, instead, use a security surveillance

12

system, which may include video cameras or mirrors, to provide real time observation of all areas of the premises to which any patron shall have access, except restrooms." ECF No. 100-3 ¶ 20-264(B). Of course, installing cameras or mirrors is a physical change, but one that is likely less disruptive than a complete reconfiguration of the store's interior.

The Seventh Circuit has repeatedly upheld ordinances requiring managers to have direct sightlines into sexually explicit video viewing booths. *See Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 1003-04 (7th Cir. 2002); *Matney v. Cnty. of Kenosha*, 86 F.3d 692, 696-97 (7th Cir. 1996). Such ordinances are narrowly tailored to combat negative secondary effects by "preventing the spread of disease and maintaining sanitary and safe conditions at sexually-oriented businesses," and leave open ample alternative channels of communication. *Pleasureland*, 288 F.3d at 1004; *see also Matney*, 86 F.3d at 696-97. In light of the established Seventh Circuit precedent, despite the fact that Zebulon may bear some costs of compliance, subsections B and E pass constitutional muster.

Subsections L and M require that licensed adult-entertainment facilities have exterior and interior lighting that meets specified brightness levels. ECF No. 100-3 § 20-264. Subsections H and I, in turn, require that facilities post signs announcing that video viewing booths may be occupied by only one occupant at

13

once, that booths are subject to inspection at any time, and that sexual activity is prohibited on the premises. *Id.* The evidentiary record considered by the Ad Hoc Adult Business Committee included materials tending to show that adequate lighting and signage could curtail some of the secondary effects associated with businesses containing sexually explicit video viewing booths, including secondary effects such as crime and unsanitary conditions. ECF No. 101-4 ¶¶ 46, 83; ECF No. 101-6 ¶¶ 55-57; ECF No. 120-1 ¶ 35. Zebulon has not challenged those evidentiary materials or DuPage's conclusions regarding its government interest in preventing those secondary effects. Moreover, other courts have found that similar lighting and signage requirements are narrowly tailored and otherwise satisfy intermediate scrutiny. *See Mattingly v. City of New Albany*, No. 4:09-cv-0051-TWP-WGH, 2012 WL 177408, at *3 (S.D. Ind. Jan. 20, 2012) (ordinance requiring adult cabarets to install bright lights and post conspicuous "No Loitering" signs did not unlawfully restrict speech or expression); *Metro Pony, LLC v. City of Metropolis*, No. 11-cv-144-JPG, 2012 WL 1389656, at *2, *13 (S.D. Ill. Apr. 20, 2012) (same); *see also N.W. Enters., Inc. v. City of Houston*, 27 F. Supp. 2d 754, 827 (S.D. Tex. 1998)*, aff'd in relevant part*, 352 F.3d 162 (5th Cir. 2003) (lighting requirements for sexually oriented businesses were "narrowly tailored to serve the City's substantial government interest in decreasing the

14

commission of such crimes as public lewdness and prostitution"). Summary judgment is granted as to claim V.[3]

VI.

Claim VIII asserts that the ordinance provisions challenged in the preceding counts also violate the free-speech provisions of the Illinois Constitution. ECF No. 59 ¶ 75. "[T]he Illinois Constitution may provide greater protection to free speech than does its federal counterpart," *City of Chicago v. Pooh Bah Enters., Inc.*, 865 N.E.2d 133, 168 (Ill. 2006), so it does not necessarily follow that the state analogues to the claims for which I granted summary judgment to DuPage are also deficient. However, because they present novel and complex issues of state law, I relinquish supplemental jurisdiction with regard to the state-law claims pertaining to counts V and VII. *See Duehning v. Aurora E. Unified Sch.*, 102 F. Supp. 3d 968, 982 n.5 (N.D. Ill. 2015) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).[4]

---

[3] The ordinance also requires that there be no holes in the walls of video viewing rooms. ECF No. 100-3 §§ 20-264(D), (J). There is no indication that there are currently any holes in the walls of Zebulon's booths. Accordingly, it is not clear that Zebulon has challenged this section, as it would not seem to require any physical changes to Zebulon's premises. With its ordinance, however, DuPage did specifically aim to reduce the opportunity for customers to "engage in anonymous sex through the use of 'glory holes'" adjoining two areas, ECF No. 101-4 ¶ 82, and the provisions appear tailored to that purpose.

[4] DuPage argues that I already dismissed claim VIII when I resolved its motion to dismiss. ECF No. 126 at 27-28. But to the contrary, I dismissed that claim only "to the extent [it] reassert[ed] the same challenges under the Illinois Constitution" presented in

15

VII.

For the forgoing reasons, the motion for summary judgment [101] is granted as to claims V and VII but denied as to claims I, III, and VIII.[5]

                                                      **ENTER ORDER:**

*/s/ Elaine E. Bucklo*
**Elaine E. Bucklo**
United States District Judge

Dated: March 29, 2022

---

claims II and IV, which claims I had already dismissed. *Zebulon*, 438 F. Supp. 3d at 892.

[5] In its reply in support of its motion for summary judgment, DuPage challenged the expert report of Gary Edinger, relied upon by Zebulon in its opposition, on *Daubert* grounds. *See* ECF No. 126 at 4-6. As consideration of the expert report was not necessary to resolve the motion for summary judgment and the issue is not fully briefed by the parties, I leave the *Daubert* question for another day.